## HARRISON COUNTY v. R. M. LOVE, COMPTROLLER.

### No. 979. Decided February 18, 1901.

**1. Mandamus—Comptroller.**

Before the Comptroller can be required by mandamus to draw his warrant upon the Treasurer the Legislature must prescribe the duty. The fact that a county had surplus funds in the State Treasury after paying off its bonded debt, did not make it the duty of the Comptroller to issue to it a warrant therefor. (Pp. 399-402.)

**2. Comptroller—Bond Tax—Surplus—Statutes Construed.**

The Act of May 12, 1871 (authorizing municipal aid to railways), did not provide for the disposition of any final surplus of county taxes remaining in the hands of the State Treasurer after payment of the county's bonded debt, and the Act of 1893 (Laws 1893, page 67), which authorized the State Treasurer to pay over such surplus to the county treasurer, did not make a warrant of the Comptroller necessary in such payment. (Pp. 401, 402.)

ORIGINAL APPLICATION for writ of mandamus against the Comptroller.

*F. H. Prendergast* and *John M. Gardner*, County Attorney, for relator.—Having established that these bonds in question are not outstanding obligations of the county, then what is the status of the $27,-300 now in the State treasury to the credit of this bond fund? By the Act of 1893, page 67, Revised Statutes, article 5243n, it is provided: "Whenever it shall appear to the State Treasurer that any money paid into the State treasury by any county of this State for the liquidation of subsidy bonds, issued by such county, remains to the credit of such county, after all of said subsidy bonds and interest have been paid, said State Treasurer shall pay to the treasurer of such county such remaining sum, and the treasurer of such county shall receipt therefor."

"Article 5243n. The county treasurer of such county shall place such sum of money to the credit of the general fund of such county."

We think this statute applies, and the money belongs to the county. While this statute does not provide for the Comptroller to draw his warrant, but provides only that the Treasurer shall pay to the county treasurer, still it is more in harmony with the other statutes that the Treasurer should pay out no money except on the Comptroller's warrant.

Section 11 of the Act of 1871, under which the old bonds were issued, provided that the State Treasurer should receive the money and pay it out "on warrants drawn by the State Comptroller," and Revised Statutes, article 2855, provides that "no money shall be paid out of the treasury except on the warrants of the Comptroller."

Section 12 of the Act of 1871, provides "that the county may call on the Comptroller for a statement of the account of the county as to such bonds," hence the letters from the Comptroller filed herein are proof of the facts therein stated.

I have no doubt that a warrant of the Comptroller issued under the order of the court will make it sufficiently appear to the Treasurer that he will pay the money, under Revised Statutes, article 5243n.

The court has authority to issue a mandamus against the Comptroller compelling him to draw a warrant on the State Treasurer. Jernigan v. Finley, 90 Texas, 210; May v. Finley, 91 Texas, 352.

*Robt. A. John,* Acting Attorney-General, and *T. S. Johnson,* Assistant, for respondent.

GAINES, CHIEF JUSTICE.—This is an original petition for a mandamus to compel the Comptroller of the State to draw his warrant upon the State Treasurer for the sum of $27,300, claimed to belong to the relator. The suit was brought originally against the former Comptroller, but since the induction into office of his successor the latter has been made the party defendant. The case was submitted upon a demurrer to the petition.

By an act of the Legislature approved May 12, 1871 (Laws 1871, page 29), the counties of this State were authorized by a vote of their qualified electors to aid in the construction of railroads by taking stock,

by donations, or by making loans. The county court was made the returning board, and if the proposition was found to have been carried at the election by a two-thirds vote, it was made the duty of that court to provide for an issue of bonds, which were to be signed by the presiding justice of the court and attested by the clerk with the seal of the court. But it was also provided that "no such bonds shall be issued until the court shall have first levied an annual tax upon all real and personal property situated in the county, which shall be sufficient to pay the annual interest, and not less than two per cent annually of the principal of said bonds, besides the expenses of assessing and collecting the same, which levy shall continue in force until the whole amount of the principal and interest of said bonds shall have been fully paid," etc. The bonds were required to be registered in the office of the Comptroller of the State. Section 8 of the act provided that "all taxes levied under this act shall be applied solely to the objects for which they were levied, under the direction of the State Comptroller, as follows: First to the payment of the expenses of assessing and collecting the same; second, to the payment of the annual interest of such bonds, and not less than two per cent of the principal; and if there be any excess on hand, after making the above payments for the current year, it shall be used in the purchase and cancellation of such bonds." It was made the duty of the collector of the taxes assessed under the provisions of the act to pay them to the State Treasurer, who was required to receive the same and to pay them out on the warrant of the Comptroller; and the Treasurer and Comptroller were in express terms "jointly charged with carrying into effect the purposes and objects" of the act. Section 12 also provides that "any county court may, from time to time, require from the State Comptroller a statement showing the condition of its accounts with the State, and the number and cost of bonds purchased and canceled, which shall in all cases be returned to the court after being defaced by writing across the face of each bond the name of the person from whom it was purchased, the date of cancellation, and the cost or amounts paid for the same and the number of coupons thereon." Section 14 also provides that "if it shall be ascertained at any time that the tax which has been levied for the payment of county bonds issued under the provisions of this act is insufficient to pay the annual interest and two per cent annually of the principal of such bonds, besides the expenses of assessing and collecting such tax, it shall be the duty of the Comptroller to see that such additional tax is levied and collected as will be sufficient to make such payments, which levy shall be continued in force until the whole amount of the principal and interest of said bonds shall have been fully paid."

The following facts are alleged in the petition: Under the provisions of the law referred to, Harrison County issued bonds to the amount of $300,000 to the Texas & Pacific Railway Company. In 1879 the Legislature passed an act authorizing the counties of the State by a vote to issue new bonds for the purpose of compromising their existing bonded indebtedness (Laws 1879, page 109), and in pursuance of that author-

ity the Commissioners Court of Harrison County issued a new series of bonds amounting in the aggregate to the sum of $225,000. Two thousand of these bonds were for the sum of $50 each and were numbered from 1 to 2000 consecutively; twelve hundred and fifty were for $100 each and were numbered from 2001 to 3250 consecutively; and all were duly registered in the Comptroller's office. All, as appeared by the records of that office, have been paid except those numbered from 1873 to 2000 inclusive, and from 3151 to 3249 inclusive. According to the averments of the petition, it further appears that all of the new bonds were delivered to the financial agents of the county for the purpose of compromising the old bonded indebtedness; and those numbered from 1873 to 2000 and from 3151 to 3249 inclusive were not used for that purpose and were delivered back to the county and were destroyed.

Of the fund collected as taxes for the payment of the new bonds and paid into the hands of the State Treasurer under the law, there remains in the State treasury the sum of $27,300, and it is to compel the Comptroller to draw his warrant upon the Treasurer for this sum that this suit is brought.

We think it a clear proposition that before the Comptroller can be required to draw his warrant upon the Treasurer, the Legislature must prescribe the duty. We also think it clear that the Act of March 12 1871, the provisions of which, in so far as they bear upon the question before us, we have set out either in their express terms or in substance, nowhere makes it the duty of the former to draw upon the latter in favor of any party for the surplus of a fund raised for the payment of the bonds provided for after the bonds have been fully paid. The act is as silent upon the subject as if no such surplus was contemplated. This is somewhat remarkable from the fact that by reason of a probable increase in taxable values, a surplus in some instances would almost necessarily arise; and it is the more remarkable because section 14 makes it evident that it was considered that such values might decline and that by reason thereof the tax levied by the county court for the payment of the bonds might prove insufficient for that purpose. It was probably thought that the provision which prescribes that the Comptroller shall use any surplus which might remain from the annual collection after paying the annual interest and the 2 per cent of the principal, as prescribed by the act, in the purchase of the bonds was a sufficient provision for the disposition of any surplus that might arise.

However, it is clear that there is no express provision for the disposition of a final surplus. It is true that section 11 expressly provides that the Treasurer shall pay out of the fund upon the warrants of the Comptroller, and from this provision there is a clear implication that the Comptroller shall draw his warrants when necessary to carry out the provisions and purposes of the act. But the statute does not leave us in doubt as to the objects to which the fund, when collected, should be applied. These are expressly declared by section 8; the application of the money is, (1) to the expenses of collecting, (2) to the payment

of the annual interest and 2 per cent of the principal, and the balance, if any, in the purchase of the bonds. Nothing being said as to any final surplus, we think it clear that the Legislature did not intend to provide for such disposition in the act. This was probably the result of inadvertence, but it may have been that such provision was purposely omitted for the reason that the contingency which would require such disposition would not arise for many years, and it may have been deemed best to leave the matter to the discretion of future Legislatures. The duty of the Comptroller as to drawing warrants being confined to the payment and purchase of the bonds, we conclude that under the original act he was not authorized to determine the disposition of the final surplus, and that he was not empowered to draw his warrant therefor in favor of the county from which the fund came.

Our conclusion that the Legislature of 1871 did not intend to provide for the disposition of any final surplus of the fund then authorized to be collected is strengthened by the fact that in 1893 the Legislature then in session passed an act which provided for such disposition. That act prescribes "That whenever it shall appear to the State Treasurer that any money paid into the State treasury by any county of this State for the liquidation of subsidy bonds issued by such county remains to the credit of such county after all of said subsidy bonds and interest have been paid, said State Treasurer shall pay to the treasurer of such county such remaining sum, and the treasurer of such county shall receipt therefor." Laws 1893, p. 67. But it is insisted that this provision makes it the duty of the Comptroller to draw his warrant in favor of Harrison County for the surplus in controversy in this case. We can not concur in that proposition. The fund is not the money of the State. It is a trust fund deposited with the Treasurer, and it is probable the Legislature had the power to authorize the Treasurer to pay it directly to whomsoever was equitably entitled thereto. Clearly they have by the last act imposed no duty upon the Comptroller with reference to the matter.

There are other questions suggested by the case and by the exhibits which accompany the petition which we need not discuss.

We conclude that the writ prayed for ought to be denied, and it is so ordered.

*Refused.*